UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
MICHAEL GARCIA,

                          :

            Petitioner,   :       REPORT & RECOMMENDATION

                          :

      -against-           :       05 Civ. 2428 (BSJ)(MHD)

                          :

SUSAN SCHULTZ, Superintendent,
Edgecombe Correctional Facility, :
and ELIOT SPITZER, New York
State Attorney General,   :

            Respondents.  :
----------------------------------x

TO THE HONORABLE BARBARA S. JONES, U.S.D.J.:

      Petitioner Michael Garcia seeks a writ of habeas corpus to

challenge his January 30, 2001 sentence in the New York State

Supreme Court, New York County, following a guilty plea to a charge

of criminal possession of a controlled substance in the second

degree. Garcia was sentenced to a term of eight years to life, and

by his petition he asserts that it should be vacated or modified

because his trial attorney denied him effective representation,

thus leading to the loss of an opportunity to take a plea bargain

that offered him a prison term of only three years to life. He was

released from prison two months after filing his habeas petition,

then served on parole until April 2008, and is now under no

restraint from this conviction.

      Respondents assert that Garcia's petition is moot since he was

1

released from prison shortly after he filed his petition. Alternatively, they argue that the claim is meritless.

For the reasons that follow, we recommend that the writ be denied and the petition dismissed with prejudice. Petitioner has completed both his prison term and his post-release sojourn on parole, and hence his claim is now moot. Moreover, the challenged state-court decision denying his application for relief under N.Y. Crim. Proc. L. § 440.10 was neither contrary to, nor an unreasonable application of, United States Supreme Court precedent.

## Proceedings in State Court

Garcia was arrested on November 29, 1999 while driving a minivan with one passenger, named Henry Acosta Valencia. In the course of an assertedly consented-to search, the police allegedly discovered 22 pounds of cocaine in the vehicle. On December 3, 1999 both men were indicted on a charge of first-degree criminal possession of a controlled substance. (Pet. Ex. at A000001; Declaration of Ass't Att'y Gen. Alyson J. Gill, Ex. B at 1-2).

Garcia, represented by criminal defense attorney Ronald L. Kuby, Esq., filed a motion that sought, in part, to suppress the fruits of the police search. (Id. Ex. B at 2). On March 7, 2000,

2

the trial court (Hon. Renee White, S.C.J.) ordered a hearing on the motion. (Id.).

At some point before a suppression hearing could be scheduled, the prosecutor made a plea offer to both defendants[1], permitting them to plead to a second-degree possession charge with a sentence of three years to life. By comparison, on the indicted charge they faced a potential term of fifteen years to life. (See Pet. Ex. at A000160).[2] Acosta accepted the offer on June 13, 2000. (Id. at A000007-08). The State subsequently withdrew the offer to Garcia, apparently because Acosta had indicated that he was willing to testify against his co-defendant. (Id. at A000010, A000013, A000021-22, A000029). Although Garcia's counsel sought to have the State reopen its prior offer, the prosecutor instead offered a plea to a second-degree possession charge with a sentence of eight years to life. (Id. at A000021-22).

On or about July 18, 2000, Garcia filed a motion seeking to

[1] Respondent represents that the offer was made on March 7, 2000. (Id.). The trial judge adopted that representation in a subsequent decision (see Pet. Ex. at A000028). She made a more equivocal finding about the timing of that offer in a later opinion. (See Pet. Ex. A000071).

[2] The pertinent sentencing provisions were later amended by the Rockefeller Drug Reform Laws (L.2004, ch. 738, §§ 1-41), which generally reduced drug offenders' exposure to long prison terms. See, e.g., People v. Bigby, 11 Misc.3d 882, 884-85, 816 N.Y.S.2d 302, 305-06 (Sup. Ct. West. Cty. 2006).

3

compel the prosecutor to reinstate the original offer. (Id. at A000010-13). The State opposed (id. at A000011-25), and Justice White denied the motion on September 11, 2000, holding that a criminal defendant has no right to have specific performance of a plea offer that has been withdrawn. (Id. at A000030-35).

On January 11, 2001, Garcia, represented by new counsel, entered a guilty plea pursuant to the second offer extended by the State. (Id. at A000157-67). He was accordingly sentenced by the trial court on January 30, 2001 to a term of eight years to life. (Id. at A000169-72).

On or about December 3, 2003, Garcia moved to vacate the conviction, contending that his prior counsel had denied him effective representation during the course of plea negotiations. (Id. at A000084-128). In substance Garcia asserted that he had always wanted to accept the initial offer by the State of a plea to second-degree possession with a sentence of the three years to life, but that Mr. Kuby had inaccurately told him that he could delay acceptance of the offer if he wanted and had not advised him that the State could withdraw the offer in the interim. (E.g., id. at A000109-13). The motion was buttressed by affidavits or affirmations from Garcia, Garcia's uncle and Kuby. (Id. at A000121-28, A000183-84).

4

In his affidavit, Garcia claimed that he had first learned of the offer from his co-defendant, that he had confirmed it with Kuby after a June 13, 2000 court conference at which he was not produced, that he had told Kuby that he wanted to accept, but that Kuby had told him that the motion had a good chance of success. (Id. at A0001226-28). Garcia reported that he had asked whether the offer would be available after the suppression hearing and that Kuby had responded that he did not know and would check with the prosecutor. (Id. at A000127). According to Garcia, he also told Kuby that he did not want to jeopardize the deal if the offer might be rescinded. He further stated that Kuby never told him that the prosecutor could revoke the offer at any time and that he risked losing the deal if his co-defendant agreed first to plead. (Id. at A000128).

As for Kuby, in his own affirmation he stated that the prosecutor had communicated the offer to him in early June and advised at the time that it would remain open until the start of a suppression hearing and that if either defendant chose to litigate the motion the offer would be withdrawn. (Id. at A000121-22). According to Kuby, he conveyed the offer to his client, who asked for time to think about it, and that Kuby encouraged him to do so, reiterating that the prosecutor had "promised" that the offer would remain open until the start of the hearing. Kuby noted that he had

5

not told Garcia that, despite the promise to keep the offer open until a suppression hearing, the State could withdraw it. He also averred that he had believed at the time that the promise to keep the offer open until a hearing was binding on the State. (Id. at A000122). As recounted by Kuby, at the next conference, on June 13, 2000, the prosecutor placed the offer on the record and said that it would remain open until a hearing started, and that he did not indicate that if one defendant accepted the offer, it would be denied to the other defendant. (Id.). According to Kuby, Garcia's co-defendant accepted the offer later on the same day and subsequently pled guilty. (Id. at A000123). In Kuby's narrative, some days later Garcia told him that he was willing to accept the deal but wanted to know whether it would still be open if he lost the suppression motion after a hearing. To answer this question Kuby spoke with William Mahoney, the Chief of Trial Bureau 60, who advised that this was not an option. Several days later the prosecutor informed Kuby that the offer had been withdrawn, but that the State would agree to a plea with an eight-year-to-life sentence, a posture confirmed at the next conference, on June 27, 2000. (Id.). When petitioner moved in July 2000 to compel reinstatement of the plea offer, the prosecutor explained that the original offer had been withdrawn because Acosta had agreed to testify against Garcia. (Id. at A000123-24).

6

Garcia supplemented this showing with a brief affirmation from his uncle, Damian Jordan. According to Jordan, Garcia had learned during plea negotiations about the offer of three years to life, and that he had discussed it with Jordan and other family members. (Id. at A000183-84). Jordan stated that "[a]fter conferring with us, [Garcia] expressed his interest in taking the plea offer and ultmately decided that he would do so." (Id. at A000184). Jordan reported that he had then communicated Garcia's wishes to Kuby, who assured him that petitioner could take advantage of the offer. (Id.).

In responding to the section 440.10 motion, the State represented that the initial offer had originally been conveyed on March 7, 2000, that Garcia had shown no interest in it and that sometime between June 13 and 27, 2000 the State had withdrawn the offer. Accordingly, the State urged denial of the motion. (Id. at A000186-96).

By decision dated March 15, 2004, Justice White denied the motion. (Id. at A000070-83). In doing so, she noted that the record of two conferences, held on March 15 and May 9, 2000, did not reflect the offer being made, and that on both occasions Garcia had expressed his interest in pursuing a hearing on his suppression motion. Similarly, at a June 6 conference defense counsel had

7

focused on the suppression motion and Garcia's bail status. As for the June 13 conference, which apparently postdated Kuby's discussion of the offer with his client, he showed no interest in it and actively sought a quick date for a suppression hearing. (Id. at A000070-76).

The judge rejected Garcia's assertion that he had always wanted to accept the plea offer. She noted that Garcia's assertion was inconsistent not only with his own account of when he told Kuby that he was interested -- an event that Garcia described as post-dating June 13, 2000 -- but also with the supporting affidavit by his uncle. She also found Garcia not credible because he had admitted his guilt during his plea allocution and then inconsistently claimed his innocence in the course of his subsequent motion. (Id. at A00077-78). Accordingly, she found that Garcia had "made an unequivocal decision to plead guilty only after his co-defendant had pleaded guilty and agreed to be a prosecution witness against him." (Id. at A000078).

Apart from this finding, Justice White determined that Kuby had not acted in a manner that denied Garcia effective representation. She noted that, according to Garcia, the offer had first been made sometime between June 6 and 13, 2000 and was withdrawn before the calendar call on June 27. She found that it

8

was not unreasonable for Kuby to assume that the prosecutor would not withdraw the offer in that time span, and that the only reason the offer was revoked was that Acosta had made a decision not only to accept the plea offer but to testify against Garcia even though such cooperation was not a condition of the plea offer. As the judge found, there was no reason for Kuby to anticipate such a development, since the plea offer to Acosta assured him of the minimum sentence that he could legally receive and only required him to plead guilty. Hence there was no advantage to Acosta from also agreeing to testify against Garcia. (Id. at A000078-83).

Garcia sought leave to appeal from this decision to the Appellate Division. On May 6, 2004, the First Department denied the application. (Id. at A000210).

Garcia next filed a direct appeal to the Appellate Division from his judgment of conviction. On that appeal he argued only that his sentence was excessive. The appellate court affirmed the conviction and sentence on November 30, 2004. People v. Garcia, 12 A.D.3d 1205, 786 N.Y.S.2d 372 (1st Dep't 2004). Garcia did not seek leave to appeal to the New York Court of Appeals from that decision.

Garcia finally turned to this court, filing a habeas petition

9

on February 28, 2005. He asserted a single claim, identical to that articulated on his section 440.10 motion, that Kuby had denied him effective representation by not telling him that the original plea offer of three years to life could be withdrawn by the State at any time. On April 28, 2005, within two months of the filing of the petition and before respondents had served opposing papers, Garcia was released from prison and placed on parole. (Gill Decl. Ex. D).

When respondents answered the petition, they argued first that it was moot by virtue of the termination of Garcia's prison term, which was the focus for his Sixth Amendment claim. (Resp. Memo of Law at 12-14). Alternatively, they argued that the claim was meritless, essentially for the reasons stated by Justice White. (Id. at 14-23).

This petition has pended for an embarrassingly long time, but we have determined that in the interim, on April 28, 2008, Garcia was discharged from parole. (See N.Y.S. Dep't of Correctional Servs. Inmate Information (DIN 01A1035), at http://nysdocslookup. docs.state.ny.us/GCA00P00/W1Q1/WINQ000). Neither side has advised the court of this development or addressed its significance.

ANALYSIS

Before addressing the merits of Garcia's claim, we assess the question of mootness. For reasons to be noted, we conclude that the claim is indeed moot. We then go on, in the alternative, briefly to address the question of Kuby's performance and its effect on petitioner's case. We conclude that petitioner cannot show that the rejection of his claim by the trial judge justifies the granting of habeas relief.

A. Mootness

As briefed by respondent, the question of whether petitioner has a litigable claim turned on whether his release from prison into supervision by the New York State parole authorities precludes consideration of his claim. The theory of the articulated defense was that since the posited injury to petitioner from his attorney's assertedly inadequate representation was an unduly long prison term (or at least a potentially unduly long term), his release from prison eliminated any possibility that this court could afford him meaningful relief. (Resp. Memo of Law at 12-14). In response, petitioner argued principally that some form of relief, relating to the length of his parole term, might be possible. (Pet. Memo of Law at 2-8).

In view of Garcia's later discharge from parole, the analysis is more straightforward. There plainly is no injury that this court could remedy at this point, and any possible future adverse consequences that might flow from an arguably overlong completed prison term necessarily would be purely speculative if not non-existent.

The analytical framework for a mootness analysis starts with the Supreme Court's decision in Spencer v. Kemna, 523 U.S. 1 (1998), in which the Court addressed a habeas petition that challenged a 1992 state-court order revoking his parole. The mootness issue arose because, following the filing of the habeas petition, Spencer completed his post-revocation prison term. Id. at 3. As the Court there noted, the "in custody" requirement imposed by the habeas statute is satisfied if the petitioner was subject to state custody, however defined, at the time he filed the petition, irrespective of whether he was later released, but, depending on the nature of his habeas application, post-filing developments could still moot his claims for relief. Id. at 7. The underlying constitutional requirement for a "case or controversy" meant that "throughout the litigation, the plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'" Id. (quoting Lewis v. Continental Bank Corp., 494 U.S. 472, 477

12

(1990)). If, at any time in the litigation he cannot satisfy that requirement, the case must be dismissed. See, e.g., Alvarez v. Smith, 130 S.Ct. 576, 580 (2009)(quoting Preiser v. Newkirk, 422 U.S. 395, 401 (1975)).

In the habeas context, if a petitioner challenges a conviction for which he is still serving a sentence, this linkage is obviously satisfied, as it would be if he is challenging his sentence and is still serving the challenged portion of that sentence. If, however, the sentence ends before final adjudication of the habeas petition, the question of justiciability must be addressed. "Once the convict's sentence has expired, however, some concrete and continuing injury other than the now-ended incarceration or parole -- some 'collateral consequence' of the conviction -- must exist if the suit is to be maintained." Spencer, 523 U.S. at 7-8 (citing Carafas v. LaVallee, 391 U.S. 234, 237-38 (1968)).

As noted in Spencer, over a period of decades starting in the mid-1950s the Supreme Court had indulged an increasingly robust presumption of sufficient collateral consequences if the petitioner challenged the validity of a criminal conviction. Id. at 8-10 (citing inter alia Sibron v. New York, 392 U.S. 40, 55-56 (1968)). The premise for this assumption was apparently the substantial likelihood that a record of conviction will cause the convicted

13

defendant significant adverse consequences in the future in a host of potential circumstances. See, e.g., id. at 9-10 (citing numerous decisions, including Pollard v. United States, 352 U.S. 354, 358 (1957); Sibron, 392 U.S. at 55; Evitts v. Lucy, 469 U.S. 387, 391 n.4 (1985)). See also United States v. Mercurris, 192 F.3d 290, 293 (2d Cir. 1999).

The Court in Spencer went on to observe that this liberality in assuming future adverse consequences was in some tension with the more generally applicable standards for civil plaintiffs' standing, which required a showing of concrete harm that a court could remedy. Id. at 10-12. Without altering the pre-existing presumption of remediable harm for petitioners who challenged their convictions, the Court proceeded to draw the line against Spencer, who was attacking, not his conviction, but the revocation of his parole. Citing its earlier decision in Lane v. Williams, 455 U.S. 624 (1982), see Spencer 523 U.S. at 12, the Court "decline[d] to presume that collateral consequences adequate to meet Article III's injury-in-fact requirement resulted from petitioner's parole revocation." Id. at 14. Rather, it required that the petitioner actually demonstrate such concrete consequences. Id. at 14-16.

Having laid out this analytical foundation, the Court went on to reject, as speculative and not sufficiently concrete, a set of

14

four possible adverse consequences cited by Spencer. These included (1) the possibility that the parole revocation would adversely affect future parole decisions, a real prospect in Spencer's case since he was by then already back in prison on a new conviction; (2) the potential for the parole revocation to influence future sentencing decisions; (3) the possible use of the challenged revocation to impeach him as a witness or litigant in future civil or criminal proceedings, and (4) the use of the revocation as evidence in chief in a future criminal proceeding. As to each of these, the Court simply held that they were too speculative to permit Spencer to premise his petition on the likelihood or possibility that any of these adverse effects might be realized in the future. Id..

Judged by these standards, the claim pressed by Garcia is similarly subject to dismissal. It bears emphasis that he does not challenge the validity of his conviction, and hence the traditional presumption of collateral consequences does not apply. Rather, he asserts that by virtue of the inadequacy of his trial attorney he was denied a plea arrangement under which he would have received a shorter prison term and hence was obliged to accept a somewhat longer sentence. Not only has that prison term been completed, but all concrete legal consequences of his conviction and sentence have ended since he is no longer on post-conviction supervision of any

kind. It follows that the asserted constitutional error no longer imposes any identifiable adverse consequences, collateral or otherwise, on Garcia. As for possible future consequences, we would be compelled to indulge in highly creative speculation even to imagine that the difference between having been sentenced to a minimum term of eight years rather than three years will have any adverse reverberations on Garcia, much less that they are the sort of consequences that the habeas court could now remedy. Moreover, even if we could imagine such a result, the rationale of Spencer -- in which the Court rejected a series of far more specific and likely scenarios as sufficient to trigger justiciability -- would preclude saving Garcia's claim.

Our conclusion in this respect is well supported by caselaw both predating and postdating Spencer, in which the courts have held that challenges to the validity of a sentence are mooted by the expiration of that sentence. Prior to Spencer, the Supreme Court had held that a challenge to a sentence is mooted by the completion of that sentence. See Lane, 455 U.S. at 631-33; North Carolina v. Rice, 404 U.S. 244, 248 (1971). In the wake of Spencer, that remains the governing principle. For example, the Second Circuit has recognized that under Spencer a challenge to a sentence is not entitled to the presumption of collateral consequences, and it has held that the possible effect of a lengthy sentence on

16

future sentencing was not a non-speculative collateral consequence that would avoid mooting a criminal appeal. See Mercurris, 192 F.3d at 293-94 (overruling United States v. Rivera, 164 F.3d 130, 132 (2d Cir. 1999), in light of Spencer). Indeed, our circuit court has held that an appellate challenge to a prison sentence under the United States Sentencing Guidelines was mooted when the defendant was released from prison even though he was still on supervised release. See United States v. Blackburn, 461 F.3d 259, 261-64 (2d Cir. 2006)(rejecting argument that vacatur of adverse Guideline calculation might lead on remand to reduction in length of supervised release). Accord, e.g., Gomez-Vargas v. United States, 2009 WL 1024241, *2-3 (S.D.N.Y. April 15, 2009); Brown v. Breslin, 2008 WL 857767, *16 (S.D.N.Y. March 31, 2008); see also United States v. Williams, 475 F.3d 468, 478-79 (2d Cir. 2007).

In sum, Garcia's claim of ineffective assistance assertedly leading to an inflated prison sentence is moot.

## B. The Merits

Even if we ignored the absence of a justiciable controversy, the petition would have to be denied. We briefly review the basis for this conclusion.

17

1. The Standard for Habeas Review

The stringency of federal habeas review turns on whether the state courts have passed on the merits of the petitioner's claim, that is, whether the decision of the highest state court to consider the claim is "based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (discussing 28 U.S.C. § 2254(d)). If the state court has addressed the merits, the petitioner may obtain relief only if the state court's ruling

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see, e.g., Bell v. Cone, 535 U.S. 685, 693-94 (2002); Williams v. Taylor, 529 U.S. 362, 412-13 (2000); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005); Brown v. Artuz, 283 F.3d 492, 497-98 (2d Cir. 2002).

Clearly established federal law "'refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.'" Howard, 406 F.3d at

122 (quoting Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002)). "[A] decision is 'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" Id. (quoting Williams, 529 U.S. at 413).

What constitutes an "unreasonable application" of settled law is a somewhat murkier proposition. "'A federal court may not grant habeas simply because, in its independent judgment, the "relevant state-court decision applied clearly established federal law erroneously or incorrectly."'" Id. (quoting Fuller v. Gorczyk, 273 F.3d 212, 219 (2d Cir. 2001) (quoting Williams, 529 U.S. at 411)). The Supreme Court observed in Williams that "unreasonable" did not mean "incorrect" or "erroneous," noting that the writ could issue under the "unreasonable application" provision only "if the state court identifies the correct governing legal principle from this Court's decisions [and] unreasonably applies that principle to the facts of the prisoner's case." 529 U.S. at 410-13. As implied by this language, "[s]ome increment of incorrectness beyond error is required . . . [H]owever, . . . the increment need not be great; otherwise habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'" Monroe

19

v. Kuhlman, 433 F.3d 236, 246 (2d Cir. 2006) (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)). Accord, Richard S. V. Carpinello, ___ F.3d ___, 2009 WL 4797958, *4 (2d Cir. Dec. 15, 2009).

As for the state courts' factual findings, under the habeas statute "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Richard S., 2009 WL 4797958 at *4; McKinney v. Artuz, 326 F.3d 87, 101 (2d Cir. 2003); see generally Rice v. Collins, 546 U.S. 333, 338-39 (2006).

There is no question that Justice White addressed the merits of Garcia's Sixth Amendment claim when she denied his section 440.10 motion. Accordingly, our review is circumscribed by the standards of 28 U.S.C. § 2254(d).

2. Assessment of Petitioner's Claim

To demonstrate a violation of his constitutional right to the effective assistance of counsel, a defendant must show that his lawyer's performance was "so defective that 'counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

Amendment' and that counsel's errors were 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" Brown v. Artuz, 124 F.3d 73, 79 (2d Cir. 1997) (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)). As summarized in Brown:

> To satisfy the first, or "performance," prong, the defendant must show that counsel's performance was "outside the wide range of professionally competent assistance," and to satisfy the second, or "prejudice," prong, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

Id. at 79-80 (quoting Strickland, 466 U.S. at 690, 694); accord, e.g., Palacios v. Burge, __ F.3d __, 2009 WL 4893626, *4 (2d Cir. Dec. 21, 2009); Henry v. Poole, 409 F.3d 48, 62-64 (2d Cir. 2005); Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004).

It bears emphasis that the Strickland standard is quite deferential, and that a claim of constitutional dimension does not arise unless a lawyer's error is so egregious as to amount to a failure to provide minimal professional representation. Thus, the court weighing an ineffective-assistance claim "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," and must "determine whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690;

21

accord, e.g., Loliscio v. Goord, 263 F.3d 178, 192 (2d Cir. 2001). In making this determination, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690.

The burden of proving prejudice is equally onerous. As noted, the petitioner must demonstrate "a reasonable probability" that, but for counsel's unprofessional errors, the result of the proceeding would have been different. "A reasonable probability is one sufficient to undermine confidence in the outcome of the trial or appeal." Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001)(citing Strickland, 466 U.S. at 694). Accord, e.g., Puglisi v. United States, 586 F.3d 209, 215-18 (2d Cir. 2009).

In this instance, the trial judge made certain factual findings that are both pertinent to the Sixth Amendment analysis and entirely reasonable in view of the record before her. Despite Garcia's assertion that he wished to accept the plea deal as soon as he was advised of it -- at a time when it was still available -- Justice White properly found that he was interested at that time in pursuing his suppression motion, if possible, and wanted to have some additional time to weigh the State's plea offer. This finding is supported both by the affirmation of his attorney and by the

22

affidavit of his uncle. It is also consistent with the attorney's performance at the June 13 conference, when he focused on seeking a hearing date, and it is further confirmed by the discussion that Mr. Kuby undertook with the head of the pertinent District Attorney's trial bureau, seeking clarification of whether the plea agreement would remain available after a suppression hearing.

The judge also found that the State's revocation of the offer to Garcia came about because Garcia's co-defendant agreed to testify against petitioner, a finding supported by an affirmation of the prosecutor. (See Pet. Ex. A000021-22). The judge also properly characterized this development as surprising, since the plea deal offered to Acosta was not contingent on his cooperation, but rather required only that he enter a plea to the proffered lesser charge. As the judge noted, Acosta therefore had nothing concrete to gain from his willingness to testify, and hence his decision to do so was not readily predictable by the petitioner's attorney.

Given this state of affairs, petitioner's Sixth Amendment claim is not sustainable, and in any event the decision of the state court to reject it surely cannot be characterized as either contrary to, or an unreasonable application of, settled Supreme Court precedent. The error that petitioner targets is the asserted

failure of Kuby to tell his client that the State, despite having made the plea offer and having represented that it would be available before the suppression hearing began, had the legal right to withdraw it at any time. There is no dispute about this general principle, but Kuby's failure to mention it to his client was certainly understandable in context. It appears that Kuby and his client had considerable confidence in the suppression motion -- a view that Garcia does not even attempt to show was unreasonable -- and that, given Garcia's desire, if possible, to test that assumption, it was reasonable for Kuby promptly to follow up with the prosecutor -- as he did -- to determine whether his client's desires in this respect could be honored. Once Kuby obtained confirmation of the previously stated limitation on the offer -- that it had to be accepted before the suppression hearing began -- he presumably communicated that fact to his client, but it appears that by then the opportunity to take advantage of the offer had been lost because Acosta had unexpectedly agreed to testify for the State.

While in retrospect it would have been more prudent for Kuby to advise Garcia that the offer could, at least in theory, be revoked at any time, his failure to do so presumably rested on the not unreasonable assumption that when the State extended the offer and specified that it would be available up to the time of the

hearing, he and his client could, as a practical matter, rely on that representation.[3] This assumption was particularly reasonable since the State apparently did not condition the offer to either defendant on a willingness to testify to testify against his co-defendant, thus reinforcing the notion that the offers would remain available for the specified time period before the hearing. Moreover, if counsel viewed the suppression motion as potent and his client wanted to pursue it if possible and wanted more time to consider the plea offer, it would be even more understandable that the focus of Kuby's approach would be to find out if the offer could remain available for a longer period of time. Once that effort was undertaken, the opportunity to take the offer was lost.

Apart from the absence of a clear demonstration that counsel's performance was so sub-par in this narrow respect as to amount to conduct below minimum professional standards, Garcia fails to establish that he was prejudiced by the asserted error. As the court found, Garcia wanted to wait before deciding whether to take the plea offer. Moreover, he wanted Kuby to find out whether the

---

[3] For purposes of our analysis, we accept Kuby's representation that he genuinely believed that the prosecutor's offer was irrevocable until a suppression hearing had begun. While that assumption proved incorrect, it does not save Garcia's claim since, for reasons noted and as the trial court found, even absent such a mistake a reasonable attorney in Kuby's position could well have assumed that, as a practical matter, the offer would remain on the table until a hearing had begun.

plea deal would be available after a suppression hearing. Although Garcia implies that if he had been told at the outset that the State had the right to revoke the offer at any time he would have accepted at once, the record easily permits the contrary inference, on which the state court plainly relied. As noted, Garcia was not immediately enamored of the deal, he was apparently interested in testing the suppression motion, and there was no particular reason at the time to believe that the State would so quickly revoke the offer. We infer that if Kuby had provided the advice in question -- that the offer could be revoked at any time -- his client would have asked him about the prospects for an imminent revocation, and counsel would have reasonably responded that it was not probable. Hence, it is entirely a matter of speculation whether the absence of advice about the right of the State to revoke the plea offer actually caused petitioner to lose the plea deal. Cf. Puglisi, 586 F.3d at 216-18 (rejecting petitioner's Sixth Amendment claim concerning advice about a plea because he did not establish that, absent criticized advice from counsel, he would have taken plea). Thus, Garcia fails to demonstrate prejudice, much less to show that the rejection of his prejudice argument by the state court was unreasonable under the circumstances.

In sum, given the evidence and the defensible findings of the trial judge, the ruling of that court rejecting Garcia's

ineffective-assistance claim was neither contrary to, nor an unreasonable application of, Supreme Court precedent governing Garcia's rights under the Sixth Amendment. Accordingly, no relief would be warranted even if we disregarded the mootness of the claim.

## CONCLUSION

For the reasons stated, we recommend that the writ be denied and the petition dismissed with prejudice. Since Garcia has failed to make a substantial showing of the denial of a constitutional right, we also recommend that a certificate of appealability not be issued. 28 U.S.C. § 2253(c).

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Barbara S. Jones, Room 1920, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See 28 U.S.C. § 636(b)(1); Fed.

R. Civ. P. 72, 6(a), 6(e); Thomas v. Arn, 470 U.S. 140, 150-52
(1985); DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000) (citing
Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir.
1989)).


Dated: New York, New York
       January 13, 2009

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE


Copies of the foregoing Report and Recommendation have been mailed
today to:

John W. Berry, Esq.
Lori J. Pennay, Esq.
Akin Gump Strauss Hauer & Feld LLP
590 Madison Avenue
New York, New York q0022

David Crow, Esq.
The Legal Aid Society
Criminal Appeals Bureau
199 Water Street
5th Floor
New York, New York 10038

Luke Martland, Esq.
Alyson Gill, Esq.
Assistant Attorneys General
  for the State of New York
120 Broadway
New York, New York 10271